```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x
DAWN MAZZONE-TRANI,

                Plaintiff,           MEMORANDUM & ORDER
                                     08-CV-0060(JS)(WDW)
       -against-

DONOHUE  CECERE  FUNERAL  HOME,
a/k/a  DONOHUE  CECERE  FUNERAL
DIRECTORS,  AND  CARRIAGE  FUNERAL
HOLDINGS,  INC.,  a/k/a  CARRIAGE
SERVICES, INC.,

                Defendants.
----------------------------------x
APPEARANCES:
For Plaintiffs:    David George Gabor, Esq.
                   Gabor & Gabor
                   400 Garden City Plaza, Suite 406
                   Garden City, NY 11530

For Defendants:    Michael P. Pappas, Esq.
                   Littler Mendelson
                   900 Third Avenue
                   New York, NY 10022
```

SEYBERT, District Judge,

Plaintiff Dawn Mazzone-Trani[1] filed suit against Defendants, asserting gender discrimination and retaliation claims under Title VII and the New York State Human Rights Law. Ms. Trani also asserted a New York Labor Law claim for failure to pay proper compensation. Defendants have moved for summary judgment. For the foregoing reasons, that motion is GRANTED.

---

[1] The Complaint formally identifies Plaintiff as Dawn Mazzone-Trani. But Ms. Trani's papers opposing summary judgment refer to her only as "Dawn Trani" or "Trani." Consequently, so does the Court.

BACKGROUND

Ms. Trani is a thirty eight year old female. Pl. 56.1 Stmt. ¶ 60. She holds an Associate's Degree in applied science from Nassau Community College, and is one semester shy of obtaining a Bachelor's Degree in Psychology. Def. 56.1 Stmt. ¶ 1; Pl. 56.1 Stmt. ¶ 61.

In 1996, while still in school, Ms. Trani began working in the funeral services industry. Def. 56.1 Stmt ¶ 2. Beginning in 1997, and continuing through February 2006, she worked as a Funeral Director at Defendant Donohue Cecere Funeral Home ("Cecere Home"), which Defendant Carriage Services, Inc. ("Carriage") has owned since 1998. Id. ¶ 5.

Toward the end of 2005, Ms. Trani discovered that the Cecere Home's incumbent manager had misappropriated funds. Pl. Dep. Tr. at 232. She reported this misconduct, along with other irregularities, to Mel Payne, Carriage's Chief Executive Officer. Id. Ms. Trani's information led to Carriage investigating the incumbent manager and, in February 2006, discharging him. See Def. 56.1 Stmt. ¶ 17. Carriage then asked Ms. Trani to manage the Cecere Home's day-to-day operations until they hired a permanent manager. Id. ¶ 18. But, although offering Ms. Trani these responsibilities, Carriage Regional Manager Larry Corey initially refused to give her the title of interim manager. Instead, Mr. Corey wanted to name Michael

2

Cecere, Jr. as interim manager in "name only," while giving her all the managerial responsibilities. Pl. Dep. Tr. at 370. Mr. Corey claimed that this would save paperwork, because Mr. Cecere was already registered with New York State. Id. at 371. Ms. Trani then called Mr. Payne and demanded to be named interim manager. Id. at 413-414. Later that day, Dan Stevens, a Carriage "corporate project consultant," contacted her, apologized for the situation not being "handled properly," and told her that, since she is "doing the work, that they are going to submit [her] name to the state," and appointed her interim manager. Id. at 414-415; Def. Stmt. ¶ 21.

Ms. Trani accepted the assignment and served as Cecere Home's interim manager from February 2006 until June 22, 2006. Def. 56.1 Stmt. ¶ 6. In this capacity, she managed the Cecere Home's day-to-day operations, including supervising employees and staff. Id. ¶ 20. In appreciation of her efforts as interim manager, Carriage paid her a $2,000 bonus in April 2006. Id. ¶ 22.

Sometime in March, Carriage informed Ms. Trani that she would have to apply and interview for the permanent position, just like any other candidate. Pl. Dep. Tr. at 428. Ms. Trani had a "feeling" this would be the case, and was not surprised. Id. In the Spring of 2006, Carriage posted a job opening for a permanent manager, which carried the title

3

"Managing Partner." Def. 56.1 Stmt. ¶ 23. Mr. Stevens told Ms. Trani to apply for this position, and she did so. Id. ¶¶ 24-25. Robert Sommese, the Operations Manager at another funeral home, also applied. Id. ¶¶ 15, 26. Carriage interviewed both of them, and another candidate named Ginny Sanzo. Id. ¶¶ 27, 28; Pl. 56.1 Stmt. ¶ 27.

As part of the application process, Ms. Trani took two tests, including a Caliper Profile test. Pl. Dep. Tr. at 559-561. Ms. Trani also interviewed with Mr. Stevens, and with Mr. Corey. Id. 565. Her interview with Mr. Stevens lasted about ten or fifteen minutes. Id. at 567. Her interview with Mr. Corey lasted about a half hour. Id. Mr. Corey asked roughly half personal questions, and half business questions. Id. at 569. Among other things, he asked Ms. Trani questions about her parents, her daughter, and her husband. Id.

Mr. Sommese apparently received greater consideration during the application process. He met with Mr. Stevens, Mr. Corey, another Carriage official named Catherine Kelly. Mr. Stevens, Mr. Corey and Ms. Kelly documented their interviews with Mr. Sommese as memoranda. There is no evidence, however, indicating that Mr. Stevens or Mr. Corey similarly documented their interviews with Ms. Trani. Finally, Ms. Trani also claims that Mr. Sommese and his wife were taken out to dinner.

Carriage ultimately selected Mr. Sommese for the Managing Partner position. Mr. Stevens told her that she did not get the position because she lacked "natural leadership abilities," and needed more training "to run the funeral home." Pl. Dep. Tr. at 577.

Though not promoting her to Managing Partner, Carriage did offer Ms. Trani a raise and the Assistant Manager position. Def. 56.1 Stmt. ¶ 30. Due to the promotion, Ms. Trani's base pay increased from $59,000 to $75,000. Pl. Dep. Tr. at 590. In addition, Carriage told her that, as Assistant Manager, she would have managerial responsibilities, including with respect to scheduling, community relations, and business goals. Id. ¶ 31. Ms. Trani accepted, and served as Assistant Manager from June 23, 2006 until August 18, 2006. Id. ¶ 7; Bates No. 000370.

Ms. Trani did not have a good working experience as Assistant Manager. Although she did not have "arguments" with Mr. Sommese, she did have differences of opinion with him. Pl. Dep. Tr. at 592. Mr. Sommese criticized certain aspects of her job performance, including the time she took to embalm bodies. Id. at 594-95. Specifically, Mr. Sommese thought Ms. Trani paid too much attention to detail, and told her that "the appearance of the bodies [was] not that important." Id. at 595. Mr. Sommese also criticized Ms. Trani for her choice of clothing. Id. at 593. Mr. Sommese told her to wear skirts and heels, and

5

thought she wore inappropriate colors. Id. at 596. Mr. Sommese instructed her to dress only in black, gray, or charcoal, instead of the white or light gray she sometimes favored. Id. at 596-97. On one occasion, for instance, Ms. Trani wore a white shirt with a "sandy beige jacket." Id. at 606. Mr. Sommese criticized her for this outfit. Id. at 606-607; DOO68.

In addition, Mr. Sommese criticized her diet. Id. at 597. He "referred to a study that women weren't taken seriously if they were over a certain size," recommended several diets, and told her to start exercising more. Id. at 597. During her deposition, Ms. Trani said that her weight was a "hard topic to discuss," and that Mr. Sommese's frequent comments weren't "necessary." Id. at 599. However, she declined to call them "malicious" when offered the opportunity. Id. at 598-99.

Furthermore, Mr. Sommese promoted Dawn Blinn to the position of "Office Manager," and instructed Ms. Trani that Ms. Blinn "is of equal power at our firm." Id. at 609; DOO68. Ms. Trani objected to this arrangement, because Ms. Blinn lacked "the knowledge, the experience of being in a funeral home," and couldn't perform tasks like embalming. Id. at 609-10.

On August 18, 2006, Ms. Trani resigned. Bates No. 000370. Ms. Trani had many reasons for her decision, including not being taken seriously as a manger. Pl. Dept. Tr. at 628-629.

6

DISCUSSION

I.  Standard of Review

Summary judgment is appropriate where there is no genuine dispute concerning any material facts, entitling the moving party to judgment as a matter of law. Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 67 (2d Cir. 1998) (citing Fed. R. Civ. P. 56(c)). The moving party bears the burden of showing the absence of any genuine dispute as to material facts. McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). In assessing the record to determine whether genuine disputes about material facts exist, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing summary judgment. McLee, 109 F.3d at 134.

Although the moving party bears the initial burden of showing that no genuine issues of material fact exist, once such a showing is made, the non-movant must set forth specific facts showing that there is a genuine issue for trial. Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Mere conclusory allegations or denials will not suffice." William v. Smith, 781 F.2d 319, 323 (2d Cir. 1986).

In discrimination claims brought under the Title VII and the New York State Human Rights Law, the burden shifting framework established by the Supreme Court in McDonnell-Douglas

7

Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), applies. See Ferraro v. Kellwood Co., 440 F.3d 96, 99 100 (2d Cir. 2006) (applying McDonnell-Douglas standards to NYSHRL claims). That framework requires a plaintiff in a disability discrimination case to establish a prima facie case of discrimination, after which the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action in question. Id. Once the defendant provides such a reason, the plaintiff must show sufficient potential proof for a reasonable jury to find the proffered legitimate reason was merely a pretext for discrimination. Id.

II. Defendants' Request to Strike

Ms. Trani's opposition papers principally rely on an Affidavit she swore on January 5, 2010, after Defendants moved for summary judgment, but do not cite her deposition transcript even once. This noticeable omission is likely intentional. Ms. Trani's Affidavit directly conflicts with her deposition testimony, and the Complaint's allegations, on at least two occasions.

First, Ms. Trani's Complaint alleges that Mr. Payne told her "he understood she is a woman and that she is being led by her emotions." Compl. ¶ 19. During her deposition, Ms. Trani repudiated that allegation, acknowledging that Mr. Payne

never said that. Rather, according to her deposition testimony, she just "inferred" this. Pl. Dep. Tr. 630-31. In actuality, Mr. Payne said only that she gets "emotional," without reference to her gender. Id. In addition, Ms. Trani could not recall him ever making a sexist comment. Id. Ms. Trani's Affidavit, however, repeats the same allegation she pled in the Complaint. Pl. Aff. ¶¶ 41-42.

And second, Ms. Trani's Complaint alleges that her Regional Manager, Larry Corey, threatened to terminate her if she complained of discrimination. Compl. ¶ 21. During deposition, Ms. Trani rejected the notion that Mr. Corey ever made such a threat, and could not recall him ever saying something substantively akin to what she alleged. Pl. Dep. at 649. Rather, under oath, Ms. Trani clarified that her allegation stemmed from Mr. Corey's "demeanor" and what she "felt" would happen. Id. But, notwithstanding her deposition testimony, Ms. Trani's Affidavit repeats the allegation found in the Complaint. Compl. ¶ 21.

In addition, Ms. Trani's Affidavit contains numerous allegations that were not pled in her Complaint, made elsewhere in discovery, or attested to during her 657 page deposition. For instance, she claims that Mr. Corey and other members of management "regarded me as no longer being as flexible and responsive as a man." Trani Aff. ¶ 21. She claims that Mr.

9

Corey "questioned how I would be able to handle both my work and home responsibilities." Trani Aff. ¶ 48. And she claims that both Mr. Corey and Mr. Sommese commented that "they liked to look at women in skirts and with stockings and heels as they felt it was more feminine." Trani Aff. ¶ 80.

Arguing that Ms. Trani's Affidavit is not only inconsistent, but perjurous, Defendants have moved to strike it. Def. Reply Br. at 1. The Court sees no need to go that far. See, generally, Zinaman v. USTS N.Y.S., Inc., 798 F. Supp. 128, 135 (S.D.N.Y. 1992) (noting that "[m]otions to strike are generally disfavored"). For purposes of this motion, it is sufficient to follow the Second Circuit's instruction that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. New York City Dept. of Corrections, 84 F.3d 614, 619 (2d Cir. 1996). Here, Defendants questioned Ms. Trani at length during deposition, particularly with respect to Mr. Corey, Mr. Payne and Mr. Sommese, until they fully exhausted Ms. Trani's recollection. This questioning resulted in Ms. Trani repudiating some of the Complaint's allegations, but did not lead to Ms. Trani mentioning any of the new allegations she raises in her Affidavit. And Ms. Trani has made no effort to explain either her borderline perjurous contradictions or her

newfound allegations. So, although the Court will not technically strike Ms. Trani's Affidavit, it will not credit it to the extent that it conflicts her deposition testimony, including contradictions by "omission or addition." Hayes, 84 F.3d at 619.

III. Ms. Trani's Hostile Work Environment Claims

Title VII prohibits "discriminat[ion] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of," inter alia, "such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This language "is not limited to 'economic' or 'tangible' discrimination" but also "includes requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (quotations and citations omitted). At the same time, Title VII "does not set forth 'a general civility code for the American workplace.'" Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (quotations and citations omitted). But "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' . . . Title VII is violated," Harris, 510 U.S. at 21. Whether conduct

is "sufficiently severe or pervasive" as to alter the victim's employment conditions "can be determined only by looking at all the circumstances." Id. at 23. These may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." Id. That being said, the working environment must be both objectively and subjectively hostile. Thus, the victim must show both that "a reasonable person" would find the conduct "hostile or abusive," and that the victim subjectively perceived it as such. See Kaytor v. Electric Boat Corp., __ F.3d __, 2010 WL 2593500, *10 (2d Cir. June 29, 2010). And it is "axiomatic" that this abuse must be "based on gender," not other considerations. Id.

Here, Ms. Trani argues that she has established a prima facie case of a hostile work environment because: "Corey and Sommese had the power to discipline her," "Trani told Payne that [Mr. Corey] was a womanizer and no steps were taken to

intervene,"[2] and "Sommese testified . . . that he did not know of any complaints" she had made. Pl. Opp. Br. at 14-15. But Ms. Trani identifies no specific hostile or abusive conduct to support her hostile work environment claim. Thus, her hostile work environment claim fails on its face. And the evidence Ms. Trani does not identify also fails to support a hostile work environment claim. At most, the record supports that: (1) Mr. Corey made a few relatively mild comments that could be considered sexist (e.g., calling her a "mother hen," suggesting that women get more emotional); (2) Mr. Sommese made some comments about her diet, and how people don't take overweight women seriously; (3) Mr. Sommese criticized her work performance in ways that lack any relation to her gender (e.g., taking too much time embalming clients, not adhering to the Cecere Home's dress code); and (4) Mr. Sommese promoted another woman to an "equal" managerial position. But (1) and (2) are quintessentially the kinds of mild "episodic" comments that are not sufficiently "pervasive" or "severe" enough to establish a hostile work environment. See Grana v. Potter, 06-CV-1173, 2009 WL 425913, *16 (E.D.N.Y. 2009); Markus v. Teachers Ins. &

---

[2] Ms. Trani's opposition brief actually claims that "Sommese was a womanizer." At deposition, however, Ms. Trani identified Mr. Corey, not Mr. Sommese, as a "womanizer." The Court presumes that Ms. Trani meant to reference Mr. Corey on page 14 of her opposition brief, and that the identification of Mr. Sommese was a typographical error.

13

Annuity Ass'n College Retirement Equities Fund, 03-CV-0646, 2005 WL 742635, *8 (S.D.N.Y. 2005). And, because (3) and (4) lack any conceivable nexus to Ms. Trani's gender, they are not evidence of a hostile work environment at all.[3]

IV. Ms. Trani's Failure to Promote Claims

Ms. Trani also asserts sex discrimination claims predicated on Defendants not promoting her to the Managing Partner position.

For purposes of these claims, Defendants concede that Ms. Trani has established her prima facie case. Def. Br. at 5. Defendants, however, contend that they failed to promote her for a legitimate nondiscriminatory reason: Mr. Sommese was better qualified. Id. at 5-6. In this regard, Defendants note that: (1) Mr. Sommese had a Bachelor's Degree in Funeral Services Administration from St. John's University[4] and a degree in

---

[3] Ms. Trani's Complaint also contains a constructive discharge claim, which Ms. Trani sparsely mentions in opposing Defendants' summary judgment motion. See Compl. ¶ 39; Pl. Opp. Br. at 9. This claim fails because, as discussed above, Ms. Trani has failed to adduce evidence supporting either discriminatory conduct or a hostile work environment.

[4] Ms. Trani contends that St. John's program is not accredited. Pl. 56.1 Stmt. ¶ 8. But this fact, even if legitimately disputed, is ultimately immaterial. Even if unaccredited, St. John's Bachelor's program must still have provided Mr. Sommese with some educational benefit. And, in addition to his St. John's degree, Mr. Sommese also earned a specialized degree in Funeral Science from the American Academy McAllister Institute of Funeral Science. Ms. Trani, on the other hand, holds only an Associate's Degree in Applied Science. Based on this

14

Funeral Service from the American Academy McAllister Institute of Funeral Science, while Ms. Trani holds only an Associate's Degree in Applied Science from Nassau Community College; (2) Mr. Sommese had seven more years of experience, having worked continuously in the industry since 1989, while Ms. Trani's experience dates only to 1996; (3) Mr. Sommese had broader industry experience, having worked in funeral directing, sales, advance planning, and management, while Ms. Trani spent nearly her entire career as a funeral director; (4) Mr. Sommese had 2.5 years of management experience, while Ms. Trani served as interim manager for only 3-4 months. See Def. Br. at 6; see also Def. 56.1 Stmt. ¶¶ 1-15. And Defendants further argue that Ms. Trani cannot demonstrate that their preference for Mr. Sommese's qualifications was pretextual.

Because Defendants argue that Mr. Sommese's superior qualifications served as their legitimate nondiscriminatory reason for the promotion decision, Ms. Trani cannot demonstrate pretext unless she shows that her "credentials [were] so superior to [Mr. Sommese's] credentials" that "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." See Byrnie v. Town of Cromwell, Bd. of Educ., 243

---

specialized degree alone, Mr. Sommese's educational credentials exceeded Ms. Trani's.

15

F.3d 93, 103 (2d Cir. 2001) (quotations and citations omitted); Lomotey v. Connecticut-Dept. of Transp., 355 Fed. Appx. 478, 480-481 (2d Cir. 2009) (applying Byrnie). She fails to do so. Indeed, Ms. Trani offers nothing substantive at all. She posits only that "[i]t is submitted that the defendants have merely raised issues of fact" and that "the evidence provided by defendants is false." Pl. Opp. Br. at 15. Quite obviously, such conclusory claims are woefully insufficient to meet the summary judgment burden Byrnie sets forth.

Even if the Court construed Ms. Trani's opposition papers liberally (which is has no obligation to do), Ms. Trani's pretext claims would still fail. At most, Ms. Trani has adduced evidence suggesting that Defendants considered Mr. Sommese a more serious candidate for the position. They took and kept notes of his interviews. His interviews lasted longer. And they took him and his wife out to dinner. None of this either attacks Mr. Sommese's credentials or bolsters Ms. Trani's, as she must do under Byrnie. Nor does it otherwise suggest pretext. On the contrary, every fact Ms. Trani has set forth is perfectly consistent with Defendants' position that they considered Mr. Sommese the better candidate, and thus devoted more time and resources to him during the interview process. In addition, Defendants needed to rely more on interviews to obtain information about Mr. Sommese, because, unlike with Ms. Trani,

16

they had not personally observed his job performance for nearly ten years.[5]

V. Ms. Trani's Retaliation Claims

Ms. Trani also asserts retaliation claims predicated on two grounds. First, Ms. Trani contends that the failure to promote her was retaliation for the informal sex discrimination complaint she raised when Mr. Corey initially refused to appoint her interim manager. And second, Ms. Trani contends that, for the same retaliatory motive, Defendants issued her a written warning in March 2006.

With respect to the failure to promote claim, it is debatable whether Ms. Trani can even establish a prima facie case. Among other things, Ms. Trani has adduced no evidence suggesting a causal connection between her informal complaint and Defendants ultimate decision to hire Mr. Sommese. See Mack

---

[5] It could be argued (although Ms. Trani does not make this argument) that the fact that Mr. Stevens gave Ms. Trani a different explanation for not promoting her demonstrates pretext. But such an argument would fail. One of Mr. Stevens' proffered reasons was that Ms. Trani needed more training "to run a funeral home." Pl. Dep. Tr. at 577. This is "not conflicting but complementary" with Defendants' proffered reason that Mr. Sommese had better qualifications. See Warren v. North Shore University Hosp. at Forest Hills, 03-CV-0019, 2006 WL 2844259, *10 (E.D.N.Y. 2006). Mr. Sommese's on-the-job training included seven years more experience than Ms. Trani, including two more years in management, and familiarity with a broad variety of industry matters beyond funeral directing. Def. 56.1 Stmt. ¶¶ 1-15. Moreover, by appointing her Assistant Manager, Defendants effectively offered to provide Ms. Trani with the very management training Mr. Stevens expressed she needed.

17

v. Otis Elevator Co., 326 F.3d 116, 129 (2d Cir. 2003). But, even if Ms. Trani meets her initial burden, her retaliatory failure to promote claim fails for the same reason her discrimination claim fails: she cannot show that Defendants' legitimate nondiscriminatory reason for promoting Mr. Sommese (his better qualifications) is pretextual. Moreover, the fact that Ms. Trani received a promotion and a 27% raise within a few months of her informal complaint seriously undercuts her unfounded retaliatory motive allegations. See Warren, 2006 WL 2844259 at *8; Cancel v. Mazzuca, 205 F. Supp. 2d 128, 144 (S.D.N.Y. 2002).

Ms. Trani's retaliation claims concerning the written warning also fail. "[W]ithout more," "oral and written warnings . . . do not constitute 'materially adverse' actions in the view of a 'reasonable employee.'" See Chang v. Safe Horizons, 254 Fed. Appx. 838, 839 (2d Cir. 2007).[6] Here, Ms. Trani provides

---

[6] Chang is only a non-precedential summary order. But Second Circuit district courts have repeatedly applied its holding. See, e.g., Nieves v. District Council 37 (DC 37), AFSCME, AFL-CIO, 04-CV-8181, 2009 WL 4281454, *8 (S.D.N.Y. 2009); Lee v. Verizon Wireless, Inc., 07-CV-0532, 2008 WL 4479410, *7 (D. Conn. 2008). And other district courts have held similarly, without expressly citing Chung. See, e.g., Ragin v. East Ramapo Cent. School Dist., 05-CV-6496, 2010 WL 1326779, *16-17 (S.D.N.Y. 2010) ("a negative or critical evaluation will not constitute an adverse employment action unless the evaluation is accompanied by other adverse consequences"); Sebold v. City of Middletown, 05-CV-1205, 2007 WL 2782527, *17 (D. Conn. 2007).

18

nothing to tie the warning she received to any negative "tangible consequences." See Miller v. Praxair, Inc., 2009 WL 1748026, *9 (D. Conn. 2009). On the contrary, less than three months after the warning, Defendants promoted her and gave her a 27% raise, thereby undercutting Ms. Trani's retaliatory case.

VI. Ms. Trani's Wage & Overtime Claims

Ms. Trani's Complaint asserts: (1) sex discrimination claims predicated on Defendants not permitting her to work overtime and not paying her for overtime she did work; and (2) a New York Labor Law § 198 claim predicated on Defendants not paying her "salary, overtime and benefits." Compl. ¶¶ 66, 68, 75, 77.

Defendants argue that Ms. Trani's sex discrimination-based overtime claims fail because, as Ms. Trani acknowledged in her deposition, Defendants did not pay overtime to any funeral director, male or female. Def. Br. at 24; Pl. Dep. Tr. at 137-138. And Defendants further contend that Ms. Trani's New York Labor Law claim fails because New York statutorily exempts funeral directors and embalmers from its wage and hour laws. Def. Br. at 24 (citing 12 N.Y.C.R.R. § 142-2.2; 29 C.F.R. § 541.301(e)(9)). Ms. Trani's opposition papers do not address Defendants' arguments, thereby abandoning these causes of action. Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when

19

a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). And Defendants' arguments would have prevailed in any event. Thus, summary judgment on these claims is also appropriate.

CONCLUSION

Defendants' motion for summary judgment is GRANTED. Defendants' request to strike Ms. Trani's Affidavit is DENIED. The Clerk of the Court is directed to mark this matter as closed.

SO ORDERED

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:  Central Islip, New York
        August 13, 2010